# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### HARRISON DIVISION

MARY L. McBRIDE                                                    PLAINTIFF

　　　　　　v.　　　　　　Civil No. 04-3019

CENTURYTEL OF MOUNTAIN HOME, INC.;
THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA; and METLIFE GROUP, INC.                               DEFENDANTS

## O R D E R

Now on this 21st day of September, 2006, comes on for consideration plaintiff's **Motion For Summary Judgment** (document #20), and from said motion, the responses thereto, and the Administrative Record filed by the parties, the Court finds and orders as follows:

1.　Plaintiff Mary L. McBride ("McBride") alleges that as an employee of defendant CenturyTel of Mountain Home, Inc. ("CenturyTel") she was a participant in an employee benefit plan (the "Plan") insured by defendants The Prudential Insurance Company of America ("Prudential") and MetLife Group, Inc. ("MetLife"). She alleges that her long term disability ("LTD") benefits under the Plan were wrongfully terminated. Her administrative remedies have been fully exhausted.

CenturyTel and Prudential admit that Prudential insures the Plan, and assert that CenturyTel, Inc., parent of CenturyTel, is the administrator of the Plan. MetLife denies that it either insures or administers the Plan.

2. The parties have treated the matter now under consideration as one for summary judgment, but the procedural posture of this case is that of an administrative appeal. The usual presumptions applicable to motions for summary judgment do not apply. The facts are those contained in the Administrative Record, and the standard for review is dictated by the terms of the Plan.

Denial of ERISA benefits is "reviewed on a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." **Firestone Tire & Rubber Co. v. Bruch**, **489 U.S. 101, 115 (1989)**. If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of that discretion. **Groves v. Metropolitan Life Insurance Co.**, **438 F.3d 872 (8th Cir. 2006)**.

The Plan in this case provides that Total Disability "exists when Prudential determines that all of these conditions are met. . . ." Such a provision gives Prudential discretionary authority to determine eligibility for benefits. **Ferrari v. Teachers Ins. and Annuity Ass'n**, **278 F.3d 801 (8th Cir. 2002)**. The Court will, therefore, review Prudential's decision to terminate McBride's LTD benefits for abuse of discretion.

The abuse of discretion standard has been described as follows:

> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. A reasonable decision is fact based and supported by substantial evidence. We may consider both the quantity and quality of evidence before a plan administrator. And we should be hesitant to interfere with the administration of an ERISA plan.

**Groves**, **438 F.3d 872, 875** (internal citations and quotation marks omitted). "Substantial evidence" is "more than a scintilla but less than a preponderance." **Leonard v. Southwestern Bell Corp. Disability Income Plan**, **341 F.3d 696, 701 (8th Cir. 2003)**.

Although abuse of discretion review puts a heavy burden on a participant whose benefits have been terminated, it does not amount to "rubber-stamping the result." A termination decision must be reasonable, i.e., "supported by substantial evidence that is assessed by its quantity and quality." **Torres v. UNUM Life Insurance Co. of America**, **405 F.3d 670, 680 (8th Cir. 2005)**.

3. The relevant Plan provisions, for purposes of this case, are two. First, the Plan provides that Total Disability exists when a participant, after the initial period of Total Disability[1], is "not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience."

Second, the Plan limits benefits for Total Disability "if your Disability, as determined by Prudential, is caused at least

---

[1]There is no dispute that McBride was past the initial period of Total Disability.

in part by a mental, psychoneurotic or personality disorder. In that case, benefits are not payable for your Disability for more than 24 months." This limitation is referred to in the Administrative Record as the "mental/nervous limitation," and the Court will so refer to it herein.

Prudential determined that McBride was disabled - although it did not state the basis of that determination - effective May 26, 1996. LTD benefits were paid until February 1, 2002, when Prudential terminated those benefits on the basis that the mental/nervous limitation had expired. Prudential does not dispute that McBride continues to be totally disabled, but takes the position that her disability is because of mental problems, and that if her mental problems could be taken out of the picture, she would be able to perform sedentary or light work in spite of her admitted physical problems. McBride now appeals this conclusion.

4.   The Court has examined the Administrative record, and finds that it reflects the following chronology of relevant facts:

* McBride worked for over 18 years as a customer service representative at CenturyTel in Mountain Home, Arkansas. This work would be classified as sedentary according to the Dictionary of Occupational Titles.

* On May 17, 1994, McBride consulted Anne E. Winkler, M.D., a Rheumatologist in Springfield, Missouri, with

-4-

complaints of arm pain, worsening over the past year, "mainly located in hands, wrists, forearms as well as upper arms, sometimes into her neck and shoulders" and "tired feeling for at least a year." She had eight "trigger points."[2] In addition to her physical problems, McBride reported "[p]roblems with depression, crying spells, concentration, exhaustion, panic attacks, nervousness and stress" to Dr. Winkler. Dr. Winkler thought McBride's physical problems were "most likely fibromyalgia,"[3] and started her on Doxepin[4].

* McBride treated with Dr. Winkler from May, 1994, until November, 1995, when her care was transferred to Jack Wilson, M.D. Dr. Wilson provided medical care for McBride from January 5, 1995, until at least December 18, 2002[5], treating her fibromyalgia with a pharmacopeia of substances and modalities, including repeated trigger point injections.

* McBride's last day to work at CenturyTel was February

---

[2]According to Stedman's Medical Dictionary, 26th Edition, a trigger point is a specific point or area where a painful response is elicited if stimulated by touch, pain or pressure. All medical definitions in this Order are drawn from Stedman's unless otherwise indicated.

[3]An "inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue." Brosnahan v. Barnhart, 336 F.3d 671, fn.1 (8th Cir. 2003), citing Jeffrey Larson, Fibromyalgia, 2 The Gale Encyclopedia of Medicine, 1326-27.

[4]A psychotherapeutic agent used to treat depression and anxiety.

[5]A note in connection with the third level of administrative appeal of McBride's claim indicates that Dr. Wilson retired in June, 2003.

26, 1996.  At that point, she found herself unable to continue working, and applied for disability benefits under the Plan because of her fibromyalgia.

* On May 28, 1996, Dr. Wilson completed an Attending Physician's Statement ("APS") in which he indicated that McBride had fibromyalgia and that her condition had worsened since it was initially diagnosed.  He indicated that "pain, stiffness, fatigue, inability to use muscles over any period to time" would prevent McBride from working.  Future changes, maximum recovery period, and permanent limits on function were all designated as "unpredictable."

* On August 9, 1996, Prudential wrote to McBride, reporting that it found her eligible for LTD benefits effective May 26, 1996.  The letter did not state the basis upon which Prudential found McBride disabled, but did point out the criteria and duration for Total Disability "[d]ue to Sickness or accidental Injury."

* On October 21, 1996, Dr. Wilson completed an APS, stating that McBride was unable to work, and was not expected to improve, as a result of fibromyalgia, due to pain, stiffness, and fatigue.

* On May 2, 1997, Douglas Stevens, Ph.D., a Clinical Psychologist, diagnosed McBride as having, among other

conditions, major depression, chronic; generalized anxiety disorder; psychological symptoms affecting medical condition; and avoidant and schizoid personality traits. It was his opinion that "[b]ased upon the history, her present emotional condition (even with heavy dosages of anti-depressant medication) and her extreme fatigue, there is no way this lady is going to be able to work."

*   On May 7, 1997, Dr. Wilson responded to several questions posed to him in a letter from Prudential. He stated that since McBride "has an incurable illness the long-term treatment goals are management of and lessening of the pain and morbidity of her condition." He stated as his opinion that McBride could not perform sedentary work or work part-time.

*   A Prudential SOAP[6] Note of September 25, 1997, summarized the report written by Dr. Stevens in May, 1997, indicating that Prudential had received it by that date.

*   On September 26, 1997, after reviewing the reports of both Dr. Wilson and Dr. Stevens, Prudential concluded that "[m]edical obtained supports a disability condition and appears that although there may be a mental nervous

[6]SOAP is an acronym for "subjective, objective, analysis, plan," the four categories considered in this type of claim documentation.

compenent [sic] to condition, cannot separate physical from mental."

* On March 10, 1998, a SOAP note indicated that "since condition has not improved will approve any occ." The Court believes "any occ." is a reference to the provision in the Plan that after the initial period of Total Disability, disability means a beneficiary is not able to perform the material and substantial duties of any job for which she is reasonably fitted.

* A Claim Summary prepared on February 12, 2001, noted that McBride had "depression, and crying spells," that she was "manic-depressive," and that she was seeing "Dr. Zubrowski (psych) meds - Effexor[7], Librium[8], Risperdal[9], Trazadone[10], and Abien[11]."

* On March 5, 2001, Dr. Wilson completed a Physical Capacities Evaluation ("PCE"), in which he indicated that McBride had reached maximum medical improvement. He considered her capable of sitting, standing, and walking for only one-half hour; of lifting only ten

---

[7]An antidepressant.

[8]An anti-anxiety agent.

[9]An anti-psychotic agent.

[10]An anti-depressant.

[11]The Court believes this to be a misspelling of Ambien, a hypnotic used to treat insomnia.

pounds; and of occasional handling/grasping, fingering kneeling, and crouching. She was never to do any pushing/pulling, climbing, stooping, crawling, or reaching above her shoulders[12].

* On September 11, 2001, a Prudential consultant, Robert Bonner, M.D., found that McBride had "a significant history of myofascial pain[13], psychiatric disease and sleep disturbance." It was his opinion that McBride's "psychiatric condition appears to influence her other complaints" and that "[h]er functional status with regard to her FMS[14] is not clear."

* On September 20, 2001, a SOAP Note stated that Prudential had "[r]eceived medical consultants review. It is believed additional clarification is needed regarding her psychiatric impairments. Therefore the file will be referred to our psychologist for review."

* On September 26, 2001, a second Prudential consultant, Daniel LoPreto, Ph.D., a Clinical Psychologist, reviewed McBride's medical records, and concluded that she "is demonstrating symptoms indicative of Pain Disorder

---

[12]This PCE, like others completed in this case, includes additional findings and restrictions. The Court has chosen to focus on those which appear relevant to McBride's ability to do sedentary or light work.

[13]The myofascia is the fascia surrounding and separating muscle tissue, and thus myofascial pain appears to refer to fibromyalgia.

[14]Fibromyalgia syndrome.

Associated With Both Psychological factors and a General Medical Condition, along with Major Depression, Chronic." He stated as his opinion that her "somatization[15] has a fairly long history and has become ingrained to the point of her becoming significantly physically de-conditioned," thus predicting "a poor prognosis for successful resolution of her chronic pain condition and hence re-integration into gainful employment." He considered McBride "permanently and totally disabled by virtue of her mental condition."

* On September 28, 2001, a SOAP Note stated "[r]eceived psych review of the file. The medical evidence does support the diagnosis of a mental condition that is disabling. However we do not have objective evidence to substantiate her physical level of impairment. The MN limit[16] on the claim ran out in 5/99[17] so we need to now determine her physical impairment level."

* A SOAP Note on October 3, 2001, states "reviewed the claim records and note that the claimant's M/N limit has expired subsequently, we must substantiate that she remains disabled primarily due to a physical condition.

_____

[15]Process by which psychological needs are expressed in physical symptoms.

[16]The Court believes this to be a reference to the mental/nervous limitation.

[17]This date is clearly wrong, based on all the other information in the Administrative Record. It should be May, 1998.

Her AP[18] reports that due to pain she is decondition [sic] and is unable to perform work activity."

\* On November 6, 2001, McBride underwent a Functional Capacities Exam ("FCE") at the request of Prudential. The examiner found that she could sit, stand, and walk for up to two hours; that she could occasionally lift 16 pounds from floor to waist, and frequently lift 8 pounds in that range; that she could utilize fine motor skills occasionally and gross motor skills frequently; that she could do no lifting from waist to overhead; that she could push, pull and carry frequently in the range of 12-17 pounds; and that she could do occasional squatting, climbing, and overhead work. The examiner rated McBride's effort as "sub-consistent," which was defined by the test as "less than consistent, but within acceptable limits of the stated diagnosis." The stated diagnosis was fibromyalgia.

\* On December 5, 2001[19], Keith Marmer[20] completed a PCE. He opined that McBride could sit for up to two hours at a time, and for eight hours in a work day with breaks; that she could only lift ten pounds; that she was

---

[18]The Court believes this to be an abbreviation for "attending physician."

[19]This date is estimated on the basis of a fax date on the document; the handwritten date is illegible.

[20]The Court is unsure of the professional speciality of Marmer. He appears to be associated with the company which conducted the FCE.

capable of frequent handling/grasping and feeling, and occasional fingering and pushing/pulling; and that she could occasionally climb, stoop, and crouch. Marmer appended a "Remark" to his PCE, as follows: "With respect to section B, please note that Ms. McBride may tolerate up to 8 hours of work activity, given regular breaks with each activity and the ability to properly recover from that activity. Additionally, Ms. McBride demonstrated an occasional ability for pulling and reaching. Given her subconsistent effort, it is possible that her actual ability may be greater."

* On January 22, 2002, Dr. Bonner revised his opinion, based on the FCE. He based his revised opinion on McBride's "inconsistent effort on several tasks" and his belief that McBride "greatly underestimate[d] her physical abilities" (he noted that she "restricted forward flexion on direct testing however fully flexed her low back with her knees locked when she bent forward to pick up a box"). His revised opinion was that "[a]bsent her psychiatric illness, she could return to at least, sedentary work similar to her pre-injury occupation." Dr. Bonner completed a PCE in which he found McBride able to sit without restriction during a work day; able to stand and walk for 3-4 hours during

-12-

a work day; able to lift 20 pounds and to frequently carry up to 10 pounds; able to do frequent handling/grasping, fingering, and pushing/pulling; able to occasionally climb, stoop, kneel, and crouch, but never to crawl.  He included a "Remark" to the effect that he had "estimated" McBride's physical abilities "absent psychiatric illness issues."

* A SOAP Note dated January 23, 2002, states that "[a]fter completing a medical and vocational review of this file, we find that the claimant does not meet the policy definition of disability."  The Note reported that McBride "has a significant history of myofascial pain, psychiatric disease, and sleep disturbance," and that her "psychiatric condition is permanently and totally disabling," but that "the mental nervous limitation on this claim expired May 26, 1998."  It concluded that "[b]ased upon the relevant medical and vocational documentation contained in the file, it appears reasonable to determine that the claimant retains the functional capacity and ability to perform gainful employment within the sedentary to light exertion level."

* On January 31, 2002, Prudential notified McBride that it was terminating her LTD benefits effective February 1,

2002. This letter outlined the mental/nervous limitation, and stated that "[d]espite your significant psychiatric condition, physically you would be capable of performing sedentary to light work including your customer service representative occupation." On that basis, Prudential terminated McBride's LTD benefits.

* On February 4, 2002, McBride appealed Prudential's termination decision.

* On February 11, 2002, Dr. Wilson wrote "To Whom It May Concern," stating his surprise over Prudential's termination: "Ms. McBride is disabled on account of fibromyalgia. The biggest problem with fibromyalgia is pain, fatigue and tenderness of her torso. The letter from Prudential denying her disability status is incredulous because it asserts because of the fact that an examiner they sent to her house could not demonstrate limitation of motion that she was not disabled. Limitation of motion is not the issue. The patient's fibromyalgia has gradually deteriorated over the years that I have cared for her. That is the reason she is receiving the medication that she is on and does periodically receive injections."

* On April 18, 2002, a Prudential consultant, Andrew Porges, M.D., Rheumatologist, stated, based on his

review of the records, that McBride's medical documentation "does confirm the diagnosis of fibromyalgia," but that it "reveals subjective but not objective evidence of physical inability to work," only "[s]elf reported complaints of pain and weakness, as well as fatigue." Dr. Porges had reviewed a videotape of the FCE, and agreed that it "does reveal an obese female who moves in a manner typical of a fibromyalgia patient," but opined that "in terms of her fibromyalgia, there is nothing limiting Ms. McBride's ability to perform regular employment, as long as this would include sedentary or light physical activities." Dr. Porges completed a PCE finding that McBride was capable of sitting for 8 hours during a workday; of standing for three hours; of walking for one hour; of lifting 20 pounds and frequently lifting up to 10 pounds; of unlimited handling/grasping, fingering, pushing/pulling; of occasional climbing, stooping, and kneeling; but not capable of crouching or crawling.

* A SOAP Note dated April 29, 2002, noted that "Dr. Wilson said that the problems arising from Ms. McBride's condition are pain, fatigue, and tenderness of her torso not limitation of motion. Dr. Wilson also said that Ms. McBride's condition has gradually deteriorated over the

years."  The Note went on to report that "medical records supported that she had multiple trigger points typical of the fibromyalgia;  however, her physical exams revealed no significant musculoskeletal disease."

* On May 17, 2002, Prudential affirmed its decision to terminate McBride's LTD benefits.  The termination letter stated that while McBride's "medical records supported that you had multiple trigger points typical of the fibromyalgia," her "physical exams revealed no significant musculoskeletal disease."

* On September 18, 2002, McBride again appealed to Prudential to reverse its decision.

* On November 8, 2002, a SOAP Note reflected that "Dr. Wilson states the claimant's pain, fatigue, and tenderness of her torso is directly related to FMS.  He goes on to say that limitation of motion is not the issue.  And that Ms. McBride's condition has deteriorated over the years."  On the other hand, the Note reports that Prudential's consultant "noted that the records indicate diffuse musculoskeletal pain, insomnia, and fatigue with multiple trigger points typical of FMS.  However physical exams revealed no significant musculoskeletal disease."

* On November 26, 2002, another Prudential consultant,

Katherine Duvall, M.D., Occupational Medicine, completed a PCE, finding that McBride could sit without restriction during the work day; that she could stand for 3 hours and walk for 2; that she could lift only 10 pounds; that she was capable of continuous handling/grasping; and pushing/pulling, and of frequent fingering; and capable of occasional climbing, stooping, kneeling, crouching, and crawling.

* On December 5, 2002, Dr. Duvall opined that "the primary diagnosis affecting Ms. McBride's ability to work is fibromyalgia." She appeared confused about the medical facts, however, stating "that this diagnosis is basically supported by subjective complaints only," but later noting that "physical exam of trigger-points does support the diagnosis of fibromyalgia." She thought that the fibromyalgia had "plateaued," stating that Dr. Wilson had last mentioned fibromyalgia on February 16, 2001. Apparently she had not seen Dr. Wilson's letter of February 11, 2002. Dr. Duvall was of the opinion that "Ms. McBride may need to be limited from heavy lifting, continuous keyboarding, and prolonged sitting, standing, and walking," but that "[t]here is no objective evidence to support that she has an inability to do sedentary work" based on her fibromyalgia.

-17-

*   On December 18, 2002, Dr. Wilson completed a Fibromyalgia Residual Functional Questionnaire. In it he indicated that McBride had daily pain in the shoulders, arms, hands/fingers, legs, and knees/ankles/feet, precipitated by changing weather, fatigue, movement/overuse, and humidity, and frequently severe enough to interfere with attention and concentration. He placed significant limitations on reaching, handling, and fingering, and indicated that McBride could not do any repetitive activities with her fingers or arms. He indicated that McBride would need to lie down at unpredictable intervals during a work shift. He stated that she could occasionally lift 10 pounds, but never lift more than that. He stated that McBride could not work an 8-hour day and "cannot work in a competitive work site." He stated that McBride was not a malingerer, and that emotional factors do not contribute to the severity of her limitations.

*   On December 23, 2002, another Prudential consultant, Daniel Cohen, M.D., Rheumatologist, reviewed additional information along with Dr. Porges' report, and concluded that "no change is warranted in Dr. Porges' 04/18/02 opinion." Dr. Cohen appeared to misread Dr. Porges' report as stating that McBride "suffered from

exclusively subjective complaints."  In addition, it does not appear that Dr. Cohen was furnished with a copy of Dr. Wilson's letter of February 11, 2002.

* On January 21, 2003, Dr. Cohen reiterated his earlier opinion, having been supplied with a copy of Dr. Wilson's Fibromyalgia Residual Functional Questionnaire - but still not having seen Dr. Wilson's February 11, 2002, letter.

* A "Definition Recommendation" prepared in January, 2003, indicates that McBride's LTD file "was reviewed initially from a physical perspective (9/11/01).  It was believed that Ms. McBride's psychiatric condition significantly impacted her physical abilities.  The file was then reviewed on a psychological basis (9/26/01) and the claimant was found to be significantly impaired by virtue of her medical condition.  An FCE was performed (ll/6/01) indicating that the claimant had the physical capacity to function in a sedentary level of activity.  The file including the FCE was forwarded to the medical consultant for re-review (1/22/02)."

* On February 4, 2003, Prudential again affirmed its decision to terminate McBride's LTD.  As summarized by the author of the letter, "Ms. McBride's history and present condition do not support a disabling condition

of such magnitude as to preclude a return to work in a sedentary capacity."

5. McBride contends that on the facts shown above, it was an abuse of discretion for Prudential to terminate her benefits. She relies primarily on **McOsker v. Paul Revere Life Insurance Co.**, **279 F.3d 586 (8th Cir. 2002),** wherein the Court stated that "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."

The Court has examined the Administrative Record with the teachings of **McOsker** in mind, as follows:

(a) <u>What was the basis upon which benefits were initially awarded</u>?

The letter initially awarding McBride benefits does not state the basis for the award, but the evidence suggests that it was based on McBride's physical condition, not her mental condition. McBride applied for disability on the basis of fibromyalgia. The letter informing her that she had been awarded benefits also informed McBride of the criteria and duration for Total Disability "[d]ue to Sickness or accidental Injury," including the two-year limitation for "own occupation" disability, but made no mention of the Plan's two-year mental/nervous limitation.

The Court has considered, and rejected, the possibility that

Prudential simply overlooked the potential applicability of the mental/nervous limitation. The medical evidence available to Prudential during the first two years McBride was receiving benefits indicated that she was totally disabled on the basis of two separate conditions: her fibromyalgia (according to Dr. Wilson), and her mental problems (according to Dr. Stevens). In September, 1997, a claim reviewer found that while there might be a mental/nervous component to McBride's disability, it could not be separated from the physical component.

Prudential paid McBride benefits for over five years (from May 26, 1996, until February 1, 2002), when the mental/nervous limitation, if applicable, would have capped its liability at two years. The first indication that Prudential was actively focusing on the potential to terminate McBride's benefits on the basis of the mental/nervous limitation appears in the SOAP Note of September 28, 2001.

For these reasons, the Court concludes that Prudential found McBride totally disabled in 1996 on the basis of her physical condition alone, and continued to consider her totally disabled on that basis for over five years.

(b) <u>Did the information available change in any significant way before Prudential decided to terminate McBride's benefits</u>?

From the Administrative Record, it is clear that Prudential

knew - at least from September 25, 1997, when it was in possession of Dr. Stevens' May 2, 1997, report - that McBride had mental conditions that were disabling. This was not new information in the Fall of 2001, when Prudential began to focus on it for purposes of terminating her benefits. The only new items of relevant information[21] at that time were:

    * the FCE conducted on November 6, 2001;

    * the opinions of Prudential's consultants, who focused on McBride's mental health and the lack of limitation on range of motion in the FCE; and

    * the opinion of Dr. Wilson that pain and fatigue - not limitation on range of motion - were the aspects of fibromyalgia that made McBride unable to work.

In the Court's view, this "new" information was not significantly different from that available to Prudential before it decided to terminate benefits. Indeed, the only difference - other than focus - was the information that McBride did not suffer a limitation in her range of motion and that such was not the aspect of her condition which caused her to be disabled.

    (c)  Does **McOsker** apply?

Given the Court's conclusion that there was no significant change in the information available to Prudential between the time

---

[21]There is additional information about various conditions that did not contribute to any disability, and there is additional information that might prove to be about a disabling condition but which became available after exhaustion of the review process. The Court has not considered any of this type of information.

it made the initial benefits decision and the time it terminated McBride's benefits, it follows that **McOsker** applies in this case. The previous payment of benefits is, therefore, a circumstance to be considered as weighing against the propriety of Prudential's decision to discontinue those payments.

6.    Another factor which would suggest an abuse of discretion in the benefits analysis is Prudential's changing emphasis with respect to the cause of McBride's disability.  After it found McBride to be totally disabled on the basis of her physical condition in repeated reviews from 1996 to 2001, Prudential apparently chose to alter its focus in the Fall of 2001 so as to place primary emphasis on McBride's mental condition.  In trying to discern the basis for such a shift in emphasis, the Court notes:

*    The diagnosis of fibromyalgia was made by a specialist in rheumatology - the branch of medicine devoted to the study of conditions of inflammation and pain in the musculoskeletal system. It was based on criteria considered to be objective by case law in the Eighth Circuit.  **Chronister v. Baptist Health**, **442 F.3d 648 (8th Cir. 2006)**.  This diagnosis has never been refuted by any doctor who examined McBride, and, indeed, was accepted and acknowledged by Prudential's consultants.

*    Prudential took the position that McBride's "physical exams revealed no significant musculoskeletal disease."   That

position is untenable since Dr. Wilson's trigger point findings were based on physical exams and Dr. Bonner reported "a significant history of myofascial pain." Moreover, Prudential had already concluded that there was evidence of significant musculoskeletal disease, having previously found McBride's fibromyalgia significant enough to award her disability benefits on that basis.

    \*    There is no evidence that McBride's fibromyalgia ever improved, and her treating physician was of the opinion that her condition had deteriorated over time.

    \*    McBride underwent only one exam at the request of Prudential - the FCE of November, 2001. Prudential's consultants focused almost exclusively on that single exam - and on McBride's mental condition - in formulating their opinions. These consultants:

    #  appeared to focus on the fact that McBride's range of motion was not particularly limited, even though Dr. Wilson noted (in a letter the consultants appear not to have seen) that limitation of motion was never the issue;

    #  "estimated" her ability to function based on what they thought she could do if she were giving the test full effort (apparently believing that she had not done so) although "subconsistent" effort was defined by the test instrument itself as "less than consistent, but within acceptable limits of the

-24-

stated diagnosis" of fibromyalgia; and

        #     concluded that the results of the test were influenced entirely by McBride's mental condition, giving no consideration to whether fibromyalgia pain affected McBride's effort on the test.

The foregoing are not, in the Court's view, sufficient justifications for the change in focus by Prudential with respect to the basis for McBride's disability. Taken together, the foregoing facts show that, after initially relying on Dr. Winkler and Dr. Wilson, Prudential disregarded the opinions of Dr. Wilson from 2001 on. While Prudential is not required "automatically to accord special weight to the opinions of a claimant's physician," it "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." **Black & Decker Disability Plan v. Nord**, 538 U.S. 822 (2003).

The Court notes that Dr. Wilson and McBride had a doctor/patient relationship of long duration, characterized by frequent visits which allowed Dr. Wilson ample opportunities to observe his patient and evaluate her pain and fatigue. No reason is suggested as to why Dr. Wilson's opinions might have been reliable initially but later were not. Indeed, neither Prudential nor its reviewers ever suggested that his opinions were unreliable or otherwise attempted to discredit them.

In sum, therefore, the Court sees no sufficient basis for the

change in Prudential's focus as to the cause of McBride's disability.

7.    Failure to credit the opinion of the claimant's treating physician assumes more than ordinary importance in a case such as the one at bar.  Where the symptoms of physical disability are almost entirely subjective, their detection and evaluation yield much more readily to a treating physician - who can examine and observe the patient - than to an evaluating physician who merely examines and observes the records.  As noted by the Seventh Circuit (in a case cited with approval by the Eighth Circuit), fibromyalgia is

> a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features.  Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and - the only symptom that discriminates between it and other diseases of a rheumatic character - multiple tender spots. . . .

**Hawkins . First Union Corp. Long-Term Disability Plan**, **326 F.3d 914, 916 (7th Cir. 2003),** cited with approval in **Chronister v. Baptist Health**, **442 F.3d 648 (8th Cir. 2006).**

While trigger point findings consistent with fibromyalgia constitute objective evidence of the disease, completely objective evidence of the level of pain and fatigue a person experiences is impossible to come by.  The Eighth Circuit has recognized that

there may be "cases in which objective evidence simply cannot be obtained, and it would be unreasonable for an administrator to demand the impossible." **Pralutsky v. Metropolitan Life Insurance Co.**, 435 F.3d 833, 839 (8th Cir. 2006).

Here, in the Court's view, to the extent that such evidence can be produced, Dr. Wilson's long-term relationship with McBride, and his repeated prescription of medications and treatments appropriate for severe fibromyalgia pain, objectifies his opinion that her symptoms were real and significant. Accordingly, Prudential's failure to consider that opinion - without any showing of unreliability - must be factored into the abuse of discretion analysis.

8. When the Court considers the teachings of **McOsker**, coupled with Prudential's unwarranted disregard of the opinions of McBride's treating physician, it does not believe that a reasonable person could have reached the conclusion that McBride is not disabled on the basis of her physical condition. The Court, therefore, finds that Prudential abused its discretion in so concluding and in terminating McBride's LTD under the Plan.

It follows, therefore, that those benefits should be reinstated, paid current with interest, and paid forward for so long as McBride meets the criteria for LTD under the Plan.

9. McBride makes no showing of any conduct on the part of either CenturyTel or MetLife that affected the termination of her

LTD benefits, and the Court finds that McBride's claims against those defendants should be denied.

10. McBride prays, in her Complaint, for an award of attorney's fees. These are recoverable under **29 U.S.C. §1132(g)(1),** and the Court finds they are appropriate in this case, provided a properly-supported motion therefor is filed within fourteen (14) days of the date of this Order. Prudential will have ten (10) days thereafter to lodge any objection to the motion.

**IT IS THEREFORE ORDERED** that the decision of Prudential Insurance Company of America to terminate the long-term disability benefits of Mary L. McBride is hereby **reversed**, and Prudential is directed to reinstate those benefits, pay back benefits with interest current to the date of this Order, and continue to pay such benefits in the future for so long as McBride continues to be entitled to same under the terms of the employee benefit plan of CenturyTel of Mountain Home, Inc.

**IT IS FURTHER ORDERED** that if the parties are unable to agree on the amount of past-due benefits, they shall - within thirty (30) days of this Order - file simultaneous written briefs with supporting documentation so that the Court can determine the correct amount.

**IT IS FURTHER ORDERED** that plaintiff's claims against CenturyTel of Mountain Home, Inc., and MetLife Group, Inc., are

**dismissed.**

      **IT IS FURTHER ORDERED** that plaintiff is entitled to an attorney's fee, provided a properly-supported motion therefor is filed within fourteen (14) days of the date of this Order. Prudential will have ten (10) days thereafter to lodge any objection to the motion.

      **IT IS SO ORDERED.**

                       **/s/ Jimm Larry Hendren**
                       **JIMM LARRY HENDREN**
                       **UNITED STATES DISTRICT JUDGE**